USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 06/13/2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
      :
KAYE DENTISTRY, PLLC,      :
      :
                           Plaintiff,      :          13-CV-5306 (JMF)
      :
             -v-      :          OPINION AND ORDER
      :
ANDREW TURCHIN, DMD et al.,      :
      :
                       Defendants.      :
      :
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

        Plaintiff Kaye Dentistry, PLLC ("Kaye Dentistry"), a dentistry practice in New York, New York, brings claims for breach of contract and fraud against dentist Andrew Turchin and his dentistry practice, Andrew Turchin, DMD, PC (collectively, "Defendants") arising out of Kaye Dentistry's purchase of substantially all the assets of Dr. Turchin's dentistry practice. Defendants now move to dismiss the Amended Complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons stated below, Defendants' motion is GRANTED, and the Amended Complaint is dismissed in its entirety.

## BACKGROUND

        The following facts are taken from the Amended Complaint and the asset purchase agreement governing the transaction in question (Decl. Thomas M. Mullaney (Docket No. 21), Ex. A (the "Purchase Agreement")), which the Court may consider on this motion to dismiss. *See, e.g.*, *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002).

        On February 2, 2012, Plaintiff agreed to purchase from Defendants certain assets associated with Dr. Turchin's dentistry practice. (Am. Compl. ¶ 5 (Docket No. 18)). The price

of the deal was $1.7 million plus the value of the Turchin practice's accounts receivable. (*Id.*; Purchase Agreement § 1.1). The Purchase Agreement defined the assets to be sold — the "Practice Assets" — as "all of the assets, real, personal and mixed, tangible or intangible, wherever located, owned by, used by or held for use by [Andrew Turchin, DMD, PC] in connection with the [dentistry] Practice," other than specifically defined "[e]xcluded" assets not relevant here. (Purchase Agreement § 1.2). The agreement included a non-exhaustive list of the Practice Assets, one of which was "the complete list of the Practice's 'active' patients (*i.e.*, seen in the last five years), which list will be delivered at closing." (*Id.* § 1.2(ii)). The Practice Assets also included "[a]ll of Seller's goodwill associated with the Practice, including trade names, service marks, business phone numbers, internet domains and any website of Seller." (*Id.* § 1.2(iv)).

Significantly, the Purchase Agreement also provided for a due diligence period, during which the parties were to "perform a detailed accounting of the Practice Assets." (*Id.* § 9.1(viii)). The due diligence provision granted Plaintiff the right to "inspect the Premises, assets, books and records, accounts receivable and other relevant information of Seller reasonably required . . . to complete its due diligence investigation." (*Id.*). The diligence period was to last two weeks and, if at any time during this period Plaintiff "determine[d] not to move ahead with the transaction for any reason," it had the right to cancel the transaction. (*Id.*). Plaintiff did perform at least some due diligence, and the transaction ultimately closed on March 2, 2012. (Am. Compl. ¶¶ 8, 14-15). On that day, Plaintiff paid the agreed-upon price, and Defendants delivered to Plaintiff, among other things, its list of active patients. (*Id.* ¶ 14-15).

The patient list, however, proved disappointing. Although the document listed 4,481 names, Plaintiff discovered that 2,296 of the names were either patients who "had not been seen

within five years of the date of the Purchase Agreement or were duplicate names." (*Id.* ¶ 18). Accordingly, Plaintiff filed the instant lawsuit, complaining that the assets that it purchased generated "less revenue than they would have" had Plaintiff received a complete list of 4,481 patients and that it would not have paid as much as it did had Plaintiff known "the true facts." (*Id.* ¶¶ 20, 31). On those bases, Plaintiff asserts claims for breach of contract and fraud. (*Id.*). Plaintiff also alleges a second breach of contract claim, based on putatively unpaid obligations relating to certain "pre-paid work in progress," "CitiHealth deposits," "[o]verstated accounts receivable," "[s]crap metal which defendants wrongfully sold," and "[d]ental equipment and oven which defendants wrongfully removed from plaintiffs' office." (*Id.* ¶¶ 35(d), 35(e)).

On November 11, 2013, Defendants filed a motion to dismiss. (Docket No. 14). Thereafter, the Court ordered Plaintiff to file any amended complaint by December 2, 2013, and noted that Plaintiff would not be given any further opportunity to amend the complaint to address the issues raised by the motion to dismiss. (Docket No. 17). Plaintiff timely amended the initial complaint, after which Defendants filed the present motion to dismiss pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. (Docket Nos. 18, 19).

## DISCUSSION

A motion pursuant to Rule 12(b)(6) challenges the sufficiency of the allegations in the complaint. *See ATSI Commnc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). To survive such a motion, a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). More specifically, the plaintiff must allege sufficient facts to

show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570. The Court first addresses the breach of contract claims, and then turns to the fraud claim.

**A.      Breach of Contract**

To make out a claim for breach of contract under New York law, a complaint must allege "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co.*, 375 F.3d 168, 177 (2d Cir. 2004) (internal quotation marks omitted). "Causation is an essential element of damages in a breach of contract action; and, as in tort, a plaintiff must prove that a defendant's breach directly and proximately caused his or her damages." *Nat'l Market Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004) (emphasis omitted). As noted, Plaintiff brings two breach of contract claims, which the Court will consider in turn.

**1.      Patient List Breach**

The basis for Plaintiff's first contract claim is the putatively deficient patient list it received from Defendants at closing. A simple review of the Purchase Agreement, however, reveals that the claim fails as a matter of law. Nowhere in the Purchase Agreement did Defendants represent that the list was to include a certain number of patients. The agreement merely obligated Defendants to deliver "the complete list of the Practice's 'active' patients" at closing (Purchase Agreement § 1.2(ii)), and the Amended Complaint does not allege that Defendants failed to do that. Nowhere does the Amended Complaint state that Defendants failed to deliver Plaintiffs with a list, and nowhere does it claim that the list as delivered omitted any

4

active patients. (*See* Defs.' Mem. Law Supp. Mot. Dismiss ("Defs.' Mem. Law") (Docket No. 23) 3). The gravamen of Plaintiff's claim is simply that the list included names that were not those of "active patients," as some of the names on the list were duplicates, and others were of patients who had not been seen for over five years. (Am. Compl. ¶ 18). But even if those allegations are true, they are entirely consistent with Defendants' obligation, in Section 1.2(ii) of the Purchase Agreement, to provide Plaintiff with a list of all active patients.

Plaintiff also contends that Defendants violated Section 1.2(iv) of the Purchase Agreement, but that argument has even less bite. (*See* Pl.'s Mem. Opp'n Mot. Dismiss ("Pl.'s Opp'n Mem.") (Docket No. 27) 7-10). Section 1.2(iv) obligated Defendants to deliver to Plaintiff the "'goodwill' associated with the Practice, including trade names, service marks, business phone numbers, internet domains and any website of [s]eller." Although Plaintiff is surely correct that the "goodwill" Defendants were obligated to deliver was not limited to those specifically enumerated items, there is no way to understand the term "goodwill" to include a patient list — much less a list with a specific number of patients — especially where a separate provision of the agreement specifically provided for the list's delivery. *See* Black's Law Dictionary 763 (9th ed. 2009) (defining "goodwill" as "[a] business's reputation, patronage, and other intangible assets that are considered when appraising the business").

The only remotely plausible theory as to how Defendants breached the Purchase Agreement is that they included some patients on the list who had not been to the practice in over five years, even though the Purchase Agreement called only for Defendants to provide a list of "active" patients. (Am. Compl. ¶ 17). But under that theory, the breach did not "directly and proximately" cause Plaintiff any damages. *Nat'l Market Share,* 392 F.3d at 525. That is, to the extent the list included non-active patients, Plaintiff received more than it was entitled to under

5

the Purchase Agreement, not less. In short, the Amended Complaint fails to state a valid claim for breach of contract based on the patient list, no matter how the claim is understood.

### 2. Other Breaches of Contract

The basis for Plaintiff's second breach of contract claim is nearly impossible to discern. The Amended Complaint asserts that "defendants owe the following amounts to Kaye Dentistry: (a) [f]or pre-paid work in progress, $80,618.00 . . . ; (b) CitiHealth deposits: $6,676.00 . . . ; (c) [o]verstated accounts receivable: $10,555.000 . . . ; (d) [s]crap metal which defendants wrongfully sold: $2,000 . . . ; and; (e) [d]ental equipment and oven which defendants wrongfully removed from plaintiffs' office: $8,500." (Am. Compl. ¶ 35). The Amended Complaint does not, however, indicate which provisions of the Purchase Agreement obligated Defendants to pay these amounts, let alone allege any facts that would support Plaintiff's claims of entitlement. Plaintiff's opposition memorandum sheds no light on these matters, as it merely reproduces the same exact, vague allegations. (Pl.'s Opp'n Mem. 16-17).

The Purchase Agreement does include some provisions that appear to speak to these claims. For example, the Purchase Agreement provided that the parties were obligated to "adjust at Closing for any prepaid contracts or bills" (Purchase Agreement § 3.1(b)), and that "for all work in progress that ha[d] not been completed as of the Closing Date, the Seller shall be entitled to all fees for such work completed prior to the Closing Date and Buyer shall be entitled to all other fees for work in progress as it is billed and collected post-closing" (*id.* § 1.5). In addition, the price that Plaintiff was obligated to pay included the value of the Turchin practice's accounts receivable, as defined by Schedule 1.2(viii) to the Purchase Agreement. Nevertheless, conclusory assertions aside, the Amended Complaint is completely devoid of any allegations regarding how Defendants violated those provisions of the Purchase Agreement.

With respect to the "pre-paid work in progress," for example, the Amended Complaint provides no details whatsoever about the work, such as what the work was, who performed it, or when it was performed relative to the closing date.  Similarly, the assertion that Defendants owe Plaintiffs for "[o]verstated accounts receivable" is entirely conclusory, as the Amended Complaint does not indicate which accounts were overstated or by how much.  (*See* Purchase Agreement, Schedule 1.2(viii)).  Further, the Purchase Agreement contains no reference to any "CitiHealth deposits," and the Court is unable to discern the meaning of this phrase.  Finally, the Amended Complaint provides no factual content to support the assertion that Defendants "wrongfully" sold or removed scrap metal and equipment, let alone how those wrongs violated the Purchase Agreement.  Plaintiff's conclusory assertions of entitlement to specific amounts of money are not enough for the Court to draw an inference, let alone a reasonable inference, that Defendants are liable.  *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice [to state a claim].").

**B.     Fraud**

Plaintiff's final claim is for fraud.  "Under New York law, to state a cause of action for fraud, a plaintiff must allege a representation of material fact, the falsity of the representation, knowledge by the party making the representation that it was false when made, justifiable reliance by the plaintiff and resulting injury." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 291 (2d Cir. 2006) (alteration and internal quotation marks omitted).  In accordance with Rule 9(b) of the Federal Rules of Civil Procedure, those elements must be pleaded with particularity, meaning that the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.*, 723 F.3d

192, 197 (2d Cir. 2013) (internal quotation marks omitted).  Although "[m]alice, intent, knowledge, and other condition[s] of mind of a person may be averred generally . . . plaintiffs must allege facts that give rise to a strong inference of fraudulent intent," which can include either "facts to show that defendants had both motive and opportunity to commit fraud" or "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner*, 459 F.3d at 290-91 (internal quotation marks omitted).  "[W]hether a plaintiff has adequately pleaded justifiable reliance can be a proper subject for a motion to dismiss." *Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 58 F. Supp. 2d 228, 259 (S.D.N.Y. 1999).

Applying those standards here, Plaintiff's fraud claims fail as a matter of law.  Plaintiff argues first that the misrepresentation upon which it relied was the Purchase Agreement itself.  (Am. Compl. ¶ 24).  Specifically, Plaintiff posits that Defendants' misrepresentation was the statement "in the Purchase Agreement that the persons named on the [patient list] to be delivered were active patients."  (*Id.*).  That theory of fraud, however, is indistinguishable from Plaintiff's first breach of contract claim, which was predicated on Defendants' alleged failure to provide the patient list in the form required by the Purchase Agreement, and it therefore fails.  That is, Plaintiff has failed to "establish that the tortious conduct alleged in the proposed pleading is separate and distinct from any breach of the governing contract."  *Non-Linear Trading Co. v. Braddis Assocs.*, 675 N.Y.S.2d 5, 11 (1st Dep't 1998); *see also Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 389 (1987) ("It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated.  This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract . . . ." (citations omitted)).

Plaintiff also alleges that Defendants defrauded it by representing at closing that the list being provided included only "active patients," as that term was defined in the Purchase Agreement. (Am. Compl. ¶ 25). That claim fails, however, to satisfy the requirements of Rule 9(b), as it never identifies the speaker of the allegedly misleading statement that "the persons named on [the patient list] were active patients." (*Id.* ¶ 25). In addition, the Amended Complaint includes no factual allegations giving rise to an inference of fraudulent intent; instead, it merely asserts, in conclusory fashion, that "Defendants knew that their representation in the Purchase Agreement, and their subsequent representation made when they delivered the [patient list], that all of the patients on the [patient list] were active patients as defined in the Purchase Agreement . . . [were] false." (*Id.* ¶ 28). Finally, and perhaps most tellingly, the Amended Complaint fails to plead justifiable reliance. "[A]s a matter of law, a sophisticated plaintiff cannot establish that it entered into an arm's length transaction in justifiable reliance on alleged misrepresentations if that plaintiff failed to make use of the means of verification that were available to it." *HSH Nordbank AG v. UBS AG*, 941 N.Y.S.2d 59, 66 (1st Dep't 2012) (internal quotation marks omitted); *see also Global Minerals & Metals Corp. v. Holme*, 824 N.Y.S.2d 210, 215 (1st Dep't 2006) ("New York law imposes an affirmative duty on sophisticated investors to protect themselves from misrepresentations made during business acquisitions by investigating the details of the transactions and the business they are acquiring."). In this case, Plaintiff was represented by counsel in the transaction and had a two-week window in which to "perform a detailed accounting of the Practice Assets . . . and . . . inspect the Premises, assets, books and records, accounts receivable and other relevant information of Seller." (Purchase Agreement § 9.1(viii)). If, during this period, Plaintiff "determine[d] not to move ahead with the transaction for any reason," then it had the right to cancel the agreement. (*Id.*). For reasons that

are not clear, Plaintiff failed to use that opportunity to learn the size of the Turchin practice's patient base, despite its representation that the patient list represented nearly eighty-five percent of the total value of the deal. (Am. Compl. ¶ 11). Whether that crowning failure represents gamesmanship or pure incompetence is unclear and ultimately irrelevant. In either case, it is not the basis for a federal lawsuit.

## CONCLUSION

For the foregoing reasons, the motion to dismiss is GRANTED, and the Amended Complaint is dismissed in its entirety. The Clerk of Court is directed to terminate Docket No. 19 and to close the case.

SO ORDERED.

Date: June 13, 2014
New York, New York

_____
JESSE M. FURMAN
United States District Judge